UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| SWA'DRIAN LEWIS AND | * CIVIL DOCKET NUMBER: **22-1453** |
| KIMBERLY SOWELL, | * |
| | * |
| Plaintiffs | * |
| | * SECT. |
| VERSUS | * |
| | * |
| SUSAN HUTSON, ORLEANS PARISH | * |
| SHERIFF; MARLIN N. GUSMAN, | * JUDGE |
| FORMER ORLEANS PARISH SHERIFF; | * |
| OPSO CAPT. GLENN POWELL; | * |
| OPSO CAPT. STEPHEN CARTER; | * |
| OPSO MAJOR BARREA; OPSO LT. | * MAG: |
| ANTHONY FRICANO; OPSO SGT. MARY | * |
| BLACK; OPSO DEPUTY KEBRINA BADON;* |
| OPSO DEPUTY LARON SIMPSON; | * |
| OPSO DEPUTY KELLY LAUGA; | * |
| UNKNOWN OPSO DEPUTIES 1 AND 2; | * |
| WELLPATH, LLC; FRANK RATTRAY AND * |
| TERRIE DUCOTE | * |
| | * |
| Defendants | * |

*****************************************

# **COMPLAINT**

1.      This case involves the death of Anthony Hunt, who died of suicide via a drug overdose at the Orleans Justice Center ("OJC") while in the custody of Defendant Marlin Gusman, the then Sheriff of Orleans Parish.  Mr. Hunt's death was the result of multiple failures at the OJC, including a failure to recognize and respond appropriately to Mr. Hunt's obvious medical emergency, a failure to adequately staff the facility to ensure Mr. Hunt's safety, and a failure to properly screen Mr. Hunt to prevent illegal drugs from entering the facility.  These failures are

the continuation of unconstitutional patterns and practices at the Orleans Parish jail stretching back to at least 2008.

## I. JURISDICTION

2.      This action is brought pursuant to 42 U.S.C. § 1983 and the Eighth and/or Fourteenth Amendments to the United States Constitution, and 42 U.S.C. § 1988.  Jurisdiction is founded on 28 U.S.C. §§ 1331 and 1343, and the aforementioned statutory and constitutional provisions. Additionally, there is complete diversity between the parties and the amount in controversy exceeds $75,000.  28 U.S.C. § 1332.  Plaintiff also invokes supplemental jurisdiction over claims under state constitutional and statutory law pursuant to 28 U.S.C. §1367.

## II. PARTIES

### (Plaintiffs)

3.      **KIMBERLY SOWELL** is an adult citizen of the United States and is domiciled in the State of Alabama.  She is the mother of Anthony Hunt, who was unmarried.

4.      **SWA'DRIAN LEWIS** is an adult citizen of the United States and is domiciled in the State of Mississippi.  Upon information and belief, and in the alternative, it is believed that **SWA'DRIAN LEWIS** is the adult son of the decedent, Anthony Hunt.

### (Defendants)

**Named defendants herein are:**

5.      **SUSAN HUTSON**, in her official capacity as the current Sheriff of Orleans Parish, is an adult citizen of the State of Louisiana and domiciled in the Eastern District of Louisiana.  She is a final policy maker and the employer of the individual OPSO defendants identified herein.

6.      **MARLIN N. GUSMAN**, in his individual capacity as the former Sheriff of Orleans Parish, is an adult citizen of the State of Louisiana and domiciled in the Eastern District of

Louisiana. At all times described herein, he was the Sheriff of Orleans Parish and, as such, was responsible for the hiring, training, supervision, discipline, and control of the deputies under his command, as well as medical personnel. He was responsible for all actions of OPSO staff. He was also responsible for the supervision, administration, policies, practices, customs, and operations of the Orleans Parish Sheriff's Office and its correctional facilities, including the OJC. He was a final policy maker.

7.      **WELLPATH, LLC**, was at all relevant times the entity with which the Orleans Parish Sheriff's Office contracted to provide medical and mental health services to prisoners at the OJC. **WELLPATH, LLC** was responsible for the provision of all staffing, training, policies and procedures for all medical and mental health personnel at OJC.

8.      **OPSO EMPLOYEES CAPT. GLENN POWELL, CAPT. STEPHEN CARTER, MAJOR BARREA, LT. ANTHONY FRICANO, SGT. MARY BLACK, DEP. LARON SIMPSON, DEP. KEBRINA BADON, DEP. KELLY LAUGA**, and **UNKNOWN OPSO DEPUTIES 1 AND 2,** in their individual capacities as Orleans Parish Sheriff's Deputies, are adult citizens of the State of Louisiana and, on information and belief, are domiciled in the Eastern District of Louisiana. At all pertinent times, these Defendants were employed by OPSO as correctional officers assigned to the OJC and were acting in the course and scope of their employment.

9.      **FRANK RATTRAY,** in his individual capacity as a mental health practitioner employed by **WELLPATH**, is an adult citizen of the State of Louisiana and, on information and belief, is domiciled in the Eastern District of Louisiana. At all relevant times herein, **RATTRAY** was acting in the course and scope of his employment with **WELLPATH**.

10.      **TERRIE DUCOTE,** in her individual capacity as a mental health practitioner employed by **WELLPATH**, is an adult citizen of the State of Louisiana and, on information and belief, domiciled in the Eastern District of Louisiana.   At all relevant times herein, **DUCOTE** was acting in the course and scope of her employment with **WELLPATH**.

### III. FACTUAL ALLEGATIONS

11.      On or about June 11, 2021, Anthony Hunt was arrested after an hours-long stand-off with the NOPD SWAT team on an out-of-state warrant.   He was booked into OPSO custody at the Orleans Justice Center ("OJC").   He was held as a pretrial inmate at the OJC until the time of his death on June 22, 2021.

12.      OJC policies and procedures call for all incoming inmates to be body scanned using a type of x-ray machine to detect any contraband before they are admitted to the facility.   The OJC policies require that every inmate be scanned twice and that inmates are to hold their hands down by their sides so that any contraband can be visible in the scan.

13.      In a clear breach of OJC policies and procedures, Mr. Hunt was not scanned twice with his arms at his side.   Instead, **UNKNOWN OPSO DEPUTIES 1 and 2** scanned him only once, and his arms were crossed in a way that violated the protocol.   Nevertheless, on information and belief, the scanned images of Mr. Hunt showed that he was able to conceal an object in his hand, which is believed to have been the contraband drugs (Fentanyl) that he later ingested to commit suicide. **UNKNOWN OPSO DEPUTIES 1 and 2** negligently failed to review the scanned image of Mr. Hunt and allowed him to enter OJC in possession of the contraband drugs.

14.      Mr. Hunt was placed on OJC pod 1D, in cell D1019 shortly after his admission to the OJC.   On information and belief, Mr. Hunt remained on lock-down in his cell during the majority of the next ten (10) days at OJC.   It is believed that there are no windows in cell D1019

and that it has a solid metal door with only a small window and a food-slot, which was shut and locked when not in use.

15.     On June 21, 2021, Mr. Hunt asked deputies to be let out of his cell, which they refused. Mr. Hunt then broke the water sprinkler inside his cell, which caused the sprinkler system in the cell to activate. The water from the sprinkler first flooded Mr. Hunt's cell and then began to flood the dayroom and other cells on pod 1D. When an OPSO Lieutenant tried to shut the water off at the utility closet, he discovered that his supervisor keys would not unlock the closet.  He called Central Control to ask that the closet be unlocked electronically but was advised that the building had lost power and Control could not open the door.  On information and belief, it took nearly an hour for the water to be shut off.

16.     After the water was finally shut off, Defendants **LT. FRICANO** and **DEP. LAUGA** were tasked with supervising maintenance crews and inmate workers to clean up the water in pod 1D.  During the course of the cleanup, **DEP. LAUGA** found a small bag of white powder floating in the water.  On information and belief, this baggie contained some of the fentanyl that Mr. Hunt had brought with him when he was admitted into OJC.

17.     **DEP. LAUGA** gave the baggie of fentanyl to **LT. FRICANO**.  **LT. FRICANO** then took the baggie and left it on a desk in the supervisor's area for the first floor of OJC.  The baggie of drugs later disappeared from the desk and, on information and belief, no one at OPSO could determine where the drugs had gone or who had moved them.

18.     Neither **DEP. LAUGA** nor **LT. FRICANO** reported the discovery of the contraband drugs to any other OPSO personnel, nor did they take any other action with respect to the drugs. This inaction shows their deliberate indifference to the risk of harm the presence of contraband drugs in OJC poses to inmates. On information and belief, there have been numerous overdoses

amongst inmates at OJC in recent years. Theses overdoses have led to inmates being hospitalized or even dying.  If the drugs had been reported, then the cells on pod 1D would have been searched, and Mr. Hunt's later suicide using the drugs in his possession could have been prevented.  Alternatively, the failure to report the discovery of contraband drugs was the result of negligence on the part of Defendants **LAUGA** and **FRICANO**, which negligence contributed to Mr. Hunt's ultimate death.

19.     The cleanup of the water in pod 1D lasted several hours.  Although all the other cells and the dayroom were cleaned, Defendant **CAPT. CARTER** ordered that Mr. Hunt was to remain in his cell and that the cleanup crews were not to clean the water out of his cell. Therefore, Mr. Hunt remained in a flooded cell up until the time of his death some sixteen (16) hours later. Defendant **CARTER** gave this order maliciously and with the intent to punish Mr. Hunt for the destruction of the sprinkler head in the cell. This order contributed to Mr. Hunt's death by encouraging his act of self-harm and causing Mr. Hunt to remain in conditions (a cold, flooded cell) that hastened his death.

20.     Sometime around 6:00 p.m., Defendant **DEP. SIMPSON** observed Mr. Hunt cover the window in his cell door with a mattress. **DEP. SIMPSON** directed other deputies to ask Hunt to remove the mattress, which he did.

21.     At approximately 7:52 p.m., **DEP. SIMPSON** brought Mr. Hunt a sandwich and observed that his cell was still flooded.  On information and belief, around this time Mr. Hunt advised either **DEP. SIMPSON** or another inmate that he was feeling suicidal. **DEP. SIMPSON** notified the **WELLPATH** medical department, and Defendant **DUCOTE**, a Wellpath mental health professional, responded.

22.    Defendant **DUCOTE** arrived on pod 1D at 7:58 p.m. There, she found Mr. Hunt sitting cross legged on his mattress on the floor of the still-flooded cell. He was dressed only in his underclothes and was essentially non-verbal, refusing to answer questions out loud. Despite the non-private nature of the situation, **DUCOTE** tried to talk to Mr. Hunt through the solid metal door of his cell. She states that she asked Mr. Hunt if he was feeling suicidal and he shook his head to indicate "no." He somehow expressed that he wanted to get out of his cell, but **DUCOTE** stated she could not help him in that regard. **DUCOTE** then told Mr. Hunt that if he wanted to talk he could let the guards know, and she left Mr. Hunt sitting on the floor in the water of his flooded cell.

23.    **DUCOTE's** actions and inactions with regard to Mr. Hunt were deliberately indifferent and/or grossly negligent to the risk of suicide presented. Mr. Hunt was acting impulsively and irrationally, having flooded his own cell, and he had recently advised that he was feeling suicidal.  **DUCOTE's** supposed assessment of his risk of suicide consisted of looking at him through a window in a solid metal door and then yelling at him through that door. He refused to answer her questions verbally, and was otherwise acting in such a fashion that **DUCOTE** either knew or should have known that he posed a serious risk of self-harm. Despite the obvious risks presented by this situation, **DUCOTE** took no action to move Mr. Hunt out of his flooded cell (which itself posed a serious risk to his health) and she otherwise failed to respond to his suicidal ideation and bizarre behavior. These actions and inactions on the part of Defendant **DUCOTE** show her deliberate indifference and/or gross negligence to the serious risk of harm to Mr. Hunt, including the risk of self-harm.

24.    At approximately 8:30 p.m., an inmate who was helping with the water cleanup talked with Mr. Hunt briefly at the door of Hunt's cell. While they were talking, Mr. Hunt suddenly

collapsed to the floor. This inmate went to the command module to tell the deputies, and then stuck a mop handle under the door of Hunt's cell to push him to get a response. Hunt did not respond.

25.     Defendant **SGT. BLACK** arrived at Mr. Hunt's cell and observed him collapsed on the floor in the water. Instead of calling for medical help, **BLACK** took a broom stick and stuck it through the food-trap door of Hunt's cell. She poked at him several times, and, according to **BLACK**, Mr. Hunt moved a little and was apparently still breathing. Defendant **BLACK** told the inmate who had reported Mr. Hunt's collapse that Mr. Hunt was fine and the inmate should return to his cell.

26.     On information and belief, Defendant **BLACK** was aware of Mr. Hunt's prior report of suicidal ideation. She was further aware that he remained locked in a flooded cell and had collapsed in front of another inmate and was unresponsive. Even putting to one side Mr. Hunt's expression of suicidal ideation, Mr. Hunt collapsing to the floor of his cell and remaining unresponsive even when poked repeatedly with a broom stick showed that he was in the midst of a medical emergency. Instead of responding to this emergency, Defendant **BLACK** did nothing, and her inaction shows her deliberate indifference and/or gross negligence with respect to the risk of serious harm to Mr. Hunt.

27.     During the remainder of the night, Mr. Hunt remained unresponsive, lying on his mattress in the water on the floor of his flooded cell. Defendant **BLACK** was aware of his condition throughout this time and failed to call medical to check on him or to take any other actions to address the situation.

28.     At some point during the course of the night, OPSO Lieutenant Benjamin Crump became aware that Mr. Hunt was being held on lockdown in a flooded cell.  Lt. Crump asked Defendant

**KEBRINA BADON** why Mr. Hunt was being held in a flooded cell. Defendant **BADON** advised that it was on the orders of Defendant **CAPT. CARTER**. Lt. Crump contacted **CARTER** and **OPSO MAJOR BARREA** to express his objection to Hunt being held on lockdown in a flooded cell. Despite this protest from Lt. Crump, **CARTER** refused to change his orders, and **BARREA** refused to intervene. Despite the risk of serious harm presented by the situation, Mr. Hunt remained in lockdown in the flooded cell up until the time of his death.

29.     At approximately 5:56 a.m., on June 22, 2021, Defendant **BADON** was passing out breakfast trays to inmates on tier 1D. When she arrived at Hunt's cell, he was unresponsive and would not come to the food slot in the door to get his tray. **BLACK** arrived at the cell and again poked at Hunt with a broom stick through the food slot. Although Hunt allegedly lifted his head in response to the pokes, he remained basically unresponsive and would not come to the slot to retrieve his tray. Instead, he simply laid his head back down.

30.     It remained obvious that Hunt was in dire need of medical attention. However, despite their awareness during the course of the night that Hunt had expressed suicidal ideation, had suddenly and inexplicably collapsed in front of another inmate, and was lying unresponsive on the floor of a flooded cell, Defendants **BADON** and **BLACK** failed to contact medical to obtain help for Mr. Hunt, or to take any other action (such as moving him out of the flooded cell) that could have addressed the risk of serious harm the situation presented. Their inaction shows their deliberate indifference and/or gross negligence to the risk of serious harm facing Mr. Hunt.

31.     At approximately 6:56 a.m., Defendant **CAPT. POWELL** arrived on tier 1D. Defendant **BLACK** advised him that Mr. Hunt was lying on the floor of his cell in the water, and she was able to elicit only a "partial response" from him by poking him with the broom stick.

32.     Defendant **POWELL** went to Mr. Hunt's cell and observed him unconscious on his mattress in the water on the floor of his cell.  Instead of immediately calling medical, **POWELL** yelled at Mr. Hunt several times.  Mr. Hunt did not respond, although **POWELL** claims that Hunt was making a snoring sound and made a noise like "huh."  Instead of immediately calling for medical help or taking other action to determine Hunt's condition, **POWELL** continued with his other duties at the jail.  It would be more than hour before anyone called for emergency medical help for Mr. Hunt, and by that time it was too late.  **POWELL's** inaction in this regard shows his deliberate indifference and/or gross negligence with respect to Mr. Hunt's condition.

33.     As **POWELL** continued with his other duties, he happened to encounter a **WELLPATH** social worker.  **POWELL** asked the social worker to check on Hunt.  The social worker sent Defendant **FRANK RATTRAY**, a mental health professional, to check on Hunt. Defendant **RATTRAY** arrived at Hunt's cell at approximately 7:50 a.m. There, he observed Hunt lying unconscious in a pool of water.  However, instead of immediately alerting the medical unit of the obvious medical emergency, **RATTRAY** delayed the notification to medical for over thirty (30) minutes while he waited for **POWELL** to return to the tier. **RATTRAY** finally called for the medical emergency response team after **POWELL** returned to the tier and Hunt remained unresponsive.

34.     The emergency response team arrived on tier 1D at 8:25 a.m. The team found Mr. Hunt still lying in about two inches of water on the floor of his cell. He was already cold to the touch and remained unresponsive. The team had to pull him out of the water so that they could treat him. As they did so, they found a baggie of white powder fentanyl in his hand. The team administered Narcan and other treatments to Mr. Hunt, but he was declared dead shortly afterwards at approximately 9:00 a.m.

35.     The failures culminating in Anthony Hunt's death—including but not limited to a failure to prevent contraband from entering the institution; a failure to take action in response to contraband; a failure to summon medical help in response to an obvious emergency; and a failure to provide adequate mental health care, including an appropriate response to suicidal ideation— are all long-term problems at OPSO generally and in the OJC in particular. All Defendants in this matter were aware of these problems but failed to address them with adequate reforms.

36.     There is a well-documented pattern and practice at OPSO of inadequate staffing and failing to monitor the tiers housing inmates, thereby permitting and in fact creating unconstitutional risks to inmate safety. There is further a pattern and practice of failing to provide constitutionally adequate mental health care to inmates housed in OPSO facilities. There is also a pattern and practice of failing to adhere to policies and procedures. There is also a pattern and practice of failing to monitor, supervise, and discipline for OPSO deputies' failures to follow policies and procedures.

37.     The defendants, particularly Defendants **GUSMAN** and **WELLPATH**, knew, must have known, or should have known of these unconstitutional patterns and practices. There are numerous tragic examples of inmates under these Defendants' care, custody, and control being subjected to unconstitutional risks of harm, which frequently result in serious injury to inmates, or even death.

38.     At the time of the detention of Anthony Hunt by OPSO, the Defendants knew, must have known or should have known of serious deficiencies in the policies, practices and procedures at the OJC related to medical and psychiatric screening, care and observation of prisoners generally, and those suffering from mental illness—including suicidal ideation—in particular. Defendants were also aware of the inadequate staffing and inadequate training and supervision of

medical and correctional staff with regard to medical and psychiatric problems of prisoners. Despite their knowledge of these serious deficiencies, the Defendants failed to make necessary changes to policies, procedures, training, supervision, or staffing, or to intervene to see that Anthony Hunt and others in their custody were provided adequate security supervision, medical care, and treatment for serious mental health needs, including suicidal ideation.

39.     On information and belief, Defendants herein have been involved in other incidents involving inadequate supervision and treatment for prisoners with serious medical needs, including suicidal ideation and overdoses from drugs, which resulted in serious harm, injury, suffering and/or death to inmates in their care. Yet few of these Defendants and/or other OPSO and **WELLPATH** staff who were similarly derelict in their duties were appropriately disciplined or held accountable for their acts or omissions.  In addition, those responsible for training and supervising OPSO and **WELLPATH** staff have failed in their own responsibilities to provide adequate care to prisoners, and have not themselves been subject to disciplinary action or accountability for failing in their supervisory and/or training responsibilities.

40.     There have been numerous reports placing all Defendants on notice regarding the unconstitutional conditions at the jail.

41.     On October 10, 2008, the National Institute of Corrections funded a report submitted to defendant Sheriff Marlin **GUSMAN** entitled "An Operational Review of the Orleans Parish Jail."  This report documented significant, pervasive, and serious problems at the jail relating to the lack of adequate and trained staff, among other issues. The report also found "the mental health program in the jails is dramatically understaffed and the program is much too limited in scope."  The NIC report further concluded that the jail lacked adequate therapeutic services for mentally ill prisoners.

42.     On September 11, 2009, the U.S. Department of Justice, Civil Rights Division, issued a "findings letter" addressed to defendant Sheriff **GUSMAN** regarding the Orleans Parish Prison system. The Department of Justice found that "OPP fails to provide inmates with adequate mental health care that complies with constitutional standards." The Department of Justice found that the following deficiencies existed:

>   a. Inadequate suicide prevention;

>   b. Inadequate intake and referral process;

>   c. Inadequate staffing;

>   d. Inadequate assessment and treatment; and

>   e. Inadequate quality assurance review.

43.     The September 2009 findings letter also stated that "OPP fails to employ sufficient mental health staff to insure that inmates receive adequate services." In addition, the report found that "OPP fails to appropriately and timely assess and treat inmates with mental illness." In addition, the DOJ investigation revealed a "lack of attention to past mental health information and a failure to provide timely psychiatric assessment and treatment. These failures are inconsistent with generally accepted professional standards and resulted in mental health deterioration and unnecessary suffering."

44.     The September 2009 findings letter also documented inadequate staffing levels at OPP. Specifically, the letter noted that there were often too few staff to supervise inmates, resulting in tiers being left unsupervised for long periods of time. The lack of staff left both inmates and staff at risk.

45.     The Defendants were aware of these findings of the National Institute of Corrections and the Department of Justice. However, the Defendants, and in particular Defendant **GUSMAN**, failed to take necessary and appropriate actions to address these issues.

46.     On April 23, 2012, the Department of Justice issued a second findings letter, based on an on-going investigation of OPP. This letter documented continued serious constitutional violations and policies and practices that violated generally accepted standards of care for custodial institutions.

47.     In its April 2012 letter, the DOJ found that "the Orleans Parish Prison is deliberately indifferent to prisoners with serious medical and mental health needs. The jail has inadequate mechanisms to identify prisoners with mental illness and too few treatment staff to address urgent and chronic conditions." The DOJ also found that as a result of the policies and practices of the Orleans Parish Prison, prisoners suffered during their incarceration and were "returned to the community, in far too many cases, sicker and less equipped to avoid future involvement with the criminal justice system than when they entered."

48.     The April 2012 DOJ letter also noted that OPP continued to be understaffed, resulting in situations where inmates were left unsupervised for long periods of time. The letter noted that this lack of staff supervision on the tiers directly contributed to inmates' unconstitutionally high risk of harm at OPP.

49.     The April 2012 letter also noted the high levels of contraband inside OPSO facilities. The presence of such contraband contributes to the risk of harm to inmates.

50.     In 2012, a class-action Complaint asserting unconstitutional conditions at OPSO facilities was filed against Defendant **GUSMAN**. The filings and proceedings during that litigation include multiple reports by security experts and mental health/psychiatric experts, a consent

judgment signed by Defendant **GUSMAN**, testimony at a three-day Fairness Hearing, and, finally, Judge Lance Africk's lengthy and detailed order approving the consent judgment. *See Jones et al. v. Gusman et al.*, EDLA #12-cv-859.

51.     Judge Africk signed his order approving the consent judgment governing the operations of OPSO on June 6, 2013. The judgment included numerous findings and requirements regarding both staffing levels and mental healthcare at OPP. The requirements set forth in the Order were designed to bring OPSO facilities into compliance with the constitution.

52.     Judge Africk's Order outlined a number of "stark, sometimes shocking, deficiencies in OPP's medical and mental health care system." The judge summarized his findings related to mental health provision at OPP by concluding that "[t]he evidence presented shows that a lack of treatment altogether, rather than inadequate treatment, contributes to severe deficiencies in medical and mental health care at OPP." He noted that "'[a] prison that deprives inmates of basic sustenance, including adequate medical care, is incompatible with the concept of human dignity and has no place in civilized society.'" The judge specifically found that "[t]he consent judgment provisions on mental and medical health care are necessary to remedy the violation of federal rights, and they are the least intrusive means of doing so."

53.     Judge Africk's order quoted an expert who testified at a hearing in the *Jones* matter:

> I've seen a number of jails and I have not seen conditions as deplorable as I have seen in this jail, and I have not seen such absence of mental health services in the context of just abysmal physical environments and the kind of failure to monitor people and so on that I was speaking about. It was just more dramatic than I have ever seen in any other institution.

54.     Judge Africk also made findings related to the "dramatically insufficient staffing" of mental and medical health care providers. The judge echoed the conclusion of an expert in mental health and psychiatry, that "OPP's mental health staffing is 'woefully inadequate.'" The

judge noted that the ratio of nurses to prisoners makes it "impossible for the nurses to adequately evaluate and chart patients, administer medications, respond to emergencies, provide suicide monitoring, gather sick call information, and provide basic nursing services."

55. Judge Africk's order also noted the patently inadequate number of security staff at OPP. Judge Africk detailed that the lack of security staff directly contributed to the risks of harm to inmates because it resulted in tiers being left unsupervised for long periods of time. As just the most dramatic example of these failures, Judge Africk discussed videos that had emerged from OPSO prison facilities showing inmates in possession of loaded weapons while snorting cocaine and drinking beer. There are numerous other examples of the problems an absence of security staff causes, as Judge Africk's Order reflects.

56. Despite years of court proceedings and numerous court orders, a change in facilities, and a new medical contractor (**WELLPATH**), many of the problems identified in Judge Africk's Order still persist at OJC. These problems have been documented in reports issued by the Court's appointed jail Monitoring Team during the course of the *Jones* litigation. The most recent report issued after Mr. Hunt's death noted the following, amongst other problems: continued deficiencies in screening, monitoring and treatment of suicidal inmates; staffing deficiencies for security and medical personnel that resulted in unsafe conditions for inmates; training deficiencies; a high level of contraband, including contraband in possession of inmates on suicide watch; and a high number of overdoses linked to illicit drugs and hoarded medications.

57. Defendants **HUTSON** (in her official capacity), **GUSMAN** and **WELLPATH** knew, must have known or should have known of these unconstitutional conditions, as described in the *Jones* litigation and in the Monitors' reports. However, despite the move from the old OPSO facilities to the OJC in 2016, the unconstitutional conditions described above persist to this day.

These Defendants have failed to make appropriate and necessary changes in policies, procedures, staffing, training and/or facilities to protect inmates from harm, including harm from contraband, and to provide adequate care to mentally ill inmates, including those who are exhibiting suicidal ideation. These Defendants also failed to ensure that appropriate supervision and disciplinary actions were taken in situations where prisoners suffered or died as the result of inadequate or inappropriate care or treatment by OPSO and/or **WELLPATH** staff.

58.     Defendants knew, must have known, or should have known, that the standard of care for those experiencing mental health crises could not be met by the policies, procedures, or staffing of the OPSO and **WELLPATH** but failed to take appropriate steps to see that Mr. Hunt or other prisoners in similar situations received appropriate and adequate care in accordance with community standards of care.

59.     Defendants knew, must have known, or should have known of the obvious risk that the lack of staff at OJC created for inmates held in OPSO custody. However, Defendants failed to take steps to alleviate the risks caused by the lack of staff at OJC.

60.     Furthermore, despite their knowledge of these conditions, the Defendants ratified or condoned acts or omissions by OPSO and **WELLPATH** staff which caused serious harm, suffering and death to prisoners at OJC, and maintained a custom and practice whereby there was no accountability for OPSO and **WELLPATH** staff who mistreated prisoners or who violated policies, procedures or standards of care for prisoners. The Defendants' actions and inactions were a direct and motivating force that caused the death of Anthony Hunt on June 22, 2021.

61.     Defendant **GUSMAN**, as the former Sheriff of Orleans Parish, was ultimately responsible for hiring, training, supervising, disciplining and/or retaining all employees at the

OPSO.  He was responsible for all policies and procedures at OJC. He was responsible for each and every other Defendant named herein.

62.     Defendant **HUTSON**, in her official capacity as the current Sheriff of Orleans Parish, is ultimately responsible for hiring, training, supervising, disciplining and/or retaining all employees at the OPSO.  She is responsible for all policies and procedures at OJC.  She is now responsible for each and every other Defendant named herein.

63.     Defendant **WELLPATH** is ultimately responsible for hiring, training, supervising, disciplining and/or retaining the medical Defendants. It is further responsible for policies, procedures, and customs of the medical personnel at the OJC.  Further, **WELLPATH** had the responsibility and duty for the diagnosis, oversight, review, monitoring, supervision, and evaluation of Anthony Hunt's medical needs (including psychiatric needs), the delivery of care for him, and the policies and procedures governing his treatment.  **WELLPATH's** actions with respect to the care of Anthony Hunt exhibited deliberate indifference to Hunt's serious medical needs, which included suicidal ideation and the risks associated with being locked in a cold, flooded cell for a prolonged period.  Furthermore, and in the alternative, **WELLPATH's** care of Anthony Hunt fell below the applicable standard of care and was grossly negligent. **WELLPATH** is also liable under the doctrine of respondeat superior for the state-law torts and the constitutional violations of its employees, as described herein.

64.     Defendants **RATTRAY** and **DUCOTE** were responsible for providing adequate and appropriate psychiatric care for Anthony Hunt. They were responsible for the documentation and paperwork necessary for continuity of care of Anthony Hunt, including evaluation and monitoring of the medical and psychiatric condition, health, and safety of Anthony Hunt and providing appropriate and adequate psychiatric assessments for him, with proper documentation

of same.   Defendants **RATTRAY** and **DUCOTE** failed in their responsibility to ensure that Anthony Hunt was in a safe, appropriate environment (e.g., not in a flooded cell), that he was adequately screened for suicidal ideation, to report relevant facts regarding Hunt's behavior and symptoms to appropriate medical providers, and to summon emergency response personnel in a timely manner. These Defendants' actions with respect to the care of Anthony Hunt exhibited deliberate indifference to Hunt's serious medical needs. Furthermore, and in the alternative, these Defendants' care of Anthony Hunt fell below the applicable standard of care and was grossly negligent.

65.    Defendant **OPSO EMPLOYEES CAPT. GLENN POWELL, CAPT. STEPHEN CARTER, MAJOR BARREA, LT. ANTHONY FRICANO, SGT. MARY BLACK, DEP. LARON SIMPSON, DEP. KEBRINA BADON, DEP. KELLY LAUGA, and UNKNOWN OPSO DEPUTIES 1 AND 2,** are each persons who had the responsibility and duty to screen for contraband and to monitor and respond to Hunt's obvious medical emergency and to the dangerous conditions in which he was held. They further had the duty to ensure he was held in a safe, appropriate environment. Each of these Defendants failed in their duty to Mr. Hunt, exhibiting deliberate indifference and/or negligence.

66.    The failures of the above-described Defendants to comply with their duties and their breach of the applicable standards of care with respect to Anthony Hunt while he was in their custody resulted in his death.

67.    The policymaking Defendants knew that the policies, practices, and procedures with respect to security and mental healthcare at OPSO were inadequate and posed a danger of serious bodily harm to detainees at OJC. However, they took no action to correct these policies, practices, and procedures. Their failure to do so ratified and condoned these practices. Their

inaction with respect to these policies, practices, and procedures was motivated by deliberate indifference and/or culpable negligence to the serious risks to detainees.

68.     Anthony Hunt's risk of serious harm and/or death was known, obvious and must have been known, and/or should have been known to all Defendants named herein. All Defendants failed to take appropriate action and necessary measures to protect and preserve Anthony Hunt's life and safety, as set forth herein. All Defendants' actions as described herein were taken with deliberate indifference to Anthony Hunt's risk of serious bodily harm and/or failed to meet the applicable standard of care and were reckless and/or negligent or grossly negligent.

69.     The Defendants are responsible jointly and in solido for the death of Anthony Hunt.

### IV. FIRST CAUSE OF ACTION

70.     Plaintiffs repeat and re-allege each and every allegation of this Complaint.

71.     The Defendants, acting individually and together, and under color of law, engaged in a course of conduct and conspired to engage in a course of conduct that acted to deprive Anthony Hunt of his constitutional rights and did deprive him of said rights, specifically, the right of Anthony Hunt to a reasonably safe and secure place of detention, reasonable and adequate medical care, the right to be free from cruel and unusual punishment, and the right to due process and equal protection of the laws as protected by the Fourteenth Amendment and Article IV (Privileges and Immunities Clause) of the United States Constitution and 42 U.S.C. § 1983.

72.     At all times pertinent herein, the Defendants, acting individually and collectively, acted unreasonably, recklessly, and with deliberate indifference and disregard for the constitutional and civil rights and life and serious medical needs of the deceased, Anthony Hunt.

73.     The Defendants' actions were reckless, willful, wanton, and/or malicious.

74.     Defendants, individually and collectively, had the duty and ability to intervene to prevent the violations of the rights of Anthony Hunt, deceased, described herein, but failed to do so.

75.     Plaintiffs further allege that such acts as alleged herein were the proximate cause and cause in fact of the injuries sustained and the death of Anthony Hunt and the damages incurred thereby.

## V. SECOND CAUSE OF ACTION

76.     Plaintiffs repeat and re-allege each and every allegation of the Complaint.

77.     Defendants **HUTSON** (in her official capacity as Sheriff), **GUSMAN** and **WELLPATH LLC**, acting individually and collectively, established, condoned, ratified, and encouraged customs, policies, patterns, and practices that directly and proximately caused the deprivation of the civil and constitutional rights of the deceased, as alleged herein, and the damages and injuries described herein, in violation of the Fourteenth Amendment to the U.S. Constitution and 42 U.S.C. § 1983.  They did so with deliberate indifference to the rights of detainees at the OJC.

78.     These written and unwritten policies, customs, patterns and practices include but are not limited to:

        A.     Inadequate screening for contraband and other failures to prevent contraband from entering OJC;

        B.     Inadequate staffing of and failure to monitor tiers where inmates are housed;

        C.     Failures of staff to recognize and/or respond appropriately to inmates' medical emergencies;

        D.     Inadequate, improper, and unreasonable screening, treatment, monitoring and supervision of the serious medical and psychiatric needs of persons in custody;

        E.     Inadequate and unreasonable on-site medical and psychiatric staffing and coverage;

  F.  Hiring of inadequately trained and inexperienced persons to screen and monitor persons in the custody of OPSO;

  G.  Hiring of inadequately trained persons to render medical and psychiatric assessments and treatment to persons in custody;

  H.  Inadequate training, supervision, and discipline of medical personnel responsible for screening, diagnosis, and treatment of medical conditions at Orleans Justice Center;

  I.  Inadequate hiring, training, supervision, and discipline of deputies and supervisors responsible for the care, custody, and control of detainees and the identification and communication of problems and/or serious medical needs of persons in custody to appropriate medical personnel;

  J.  A pattern and practice of ignoring detainees' needs for medical and/or psychiatric treatment, and/or of providing unreasonable and patently insufficient treatment for detainees' conditions, causing serious pain, suffering, injury, and/or death; and

  K.  Inadequate quality control policies, procedures, and practices; inadequate critical incident review; inadequate mortality reviews; and inadequate identification and correction of serious deficiencies in policies and practices affecting the delivery and quality of security, medical, and psychiatric services.

79.  In addition to the injuries sustained by the Plaintiffs herein, the deliberate indifference of Defendants **GUSMAN** and **WELLPATH, LLC**, to the serious security and medical needs of detainees under their custody and control has resulted in numerous other instances of detainees suffering serious and oftentimes fatal injuries and illnesses.

80.  Defendant **HUTSON**, in her official capacity as the current Sheriff of Orleans Parish, is responsible for the pattern, practice, and policy of violations of the constitutional rights of inmates, including Anthony Hunt, as described above.

81.  At all times pertinent herein, the Defendants acted unreasonably and with deliberate indifference and disregard for the constitutional and civil rights to life and safety of the deceased, Anthony Hunt.  The actions of the Defendants were malicious, willful, wanton and reckless.

82.     Plaintiffs further allege that such acts and omissions as alleged herein were the proximate cause and cause in fact of the death of Anthony Hunt, the injuries suffered by the Plaintiffs, and the damages incurred.

## VI. THIRD CAUSE OF ACTION

83.     Plaintiffs repeat and re-allege each and every allegation of the Complaint.

84.     The supplemental jurisdiction of the Court is invoked for all claims under state law.

85.     At all times described herein, the Defendants, individually and collectively, acted negligently, with gross negligence, and/or intentionally in denying reasonable and necessary medical care to Anthony Hunt; failing to properly monitor him; confining him in unsafe, unreasonable, and dangerous conditions that contributed to his death; and in inflicting physical injury and severe emotional, mental and physical pain and suffering upon him, in violation of Louisiana constitutional and statutory law.

86.     The actions and inactions of the Defendants caused the wrongful death of Anthony Hunt. At all pertinent times the Defendant employees of the OPSO and the Defendant employees of **WELLPATH** were acting in the course and scope of their employment and the Defendants Sheriff **HUTSON,** in her official capacity**,** and/or **WELLPATH** are vicariously liable for the injuries and damages incurred herein as a result of their actions.

87.     The Defendants, **WELLPATH LLC**, **DUCOTE**, and **RATTRAY**, each acted in derogation of their duties as medical professionals and their treatment of Anthony Hunt was beneath the standard of care in the community.

88.     All Defendants named herein are liable for the wrongs complained of herein by virtue of encouraging, aiding, abetting, counseling, ratifying and condoning the commission of the afore-described acts; by their failure to properly administer, organize, and staff the medical and

correctional program; and for the failure to properly screen, hire, train, supervise, and discipline persons under their supervision and control whose acts and omissions contributed to the death of Anthony Hunt.

89.     The Defendants are liable individually and jointly (in solido) for their actions as alleged herein.

90.     Plaintiffs further allege that the above-described actions and omissions were the proximate cause and cause in fact of the injuries sustained herein.

## VII. DAMAGES

91.     As a result of the actions of the Defendants as described above, damages have been incurred as follows:

1.      Anthony Hunt (deceased) suffered conscious and severe physical, mental, and emotional distress, pain and suffering prior to his death, and lost his life.

2.      The Plaintiffs suffered emotional pain and suffering, past, present, and future; loss of support; and the loss of love, affection, and companionship of Anthony Hunt.

## VIII. PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray that after due proceedings there be judgment rendered herein in Plaintiffs' favor and against all Defendants individually and jointly, as follows:

1.      Compensatory and punitive damages as prayed for herein;

2.      Reasonable attorneys' fees, as provided in 42 U.S.C. § 1988, and all costs of these proceedings and legal interest; and

3.      All other relief as appears just and proper to this Honorable Court.

Respectfully submitted,

/s/ Gary W. Bizal

_____

**GARY W. BIZAL** (#1255)
4907 Magazine St
New Orleans, LA 70115
Telephone: (504)525-1328
Fax: (504)525-1353
gary@garybizal.com


/s/ Stephen J. Haedicke

_____

**STEPHEN J. HAEDICKE** (#30537)
Law Office of Stephen J. Haedicke, LLC
1040 Saint Ferdinand St.
New Orleans, LA 70117
(504)291-6990 Telephone
(504)291-6998 Fax
stephen@haedickelaw.com